**Charles W. WRIGHT, et al., Plaintiffs,**

v.

**XEROX CORPORATION,
et al., Defendants.**

**Civ. A. No. 95–145.**

United States District Court,
D. New Jersey.

April 19, 1995.

Robert Merenich, Post, Polak, Goodstell & MacNeill, Roseland, NJ, for plaintiffs.

Carmine A. Iannaccone, Marie Latoff, Hannoch Weisman, Roseland, NJ, for defendants.

*OPINION*

WOLIN, District Judge.

This matter is opened before the Court by the motion of defendants Bill Clinton, Donald Dea, Rich Miller and Leo Dianetti (collectively the "individual defendants") to dismiss the complaint against them pursuant to Federal Rule of Civil Procedure 12(b)(2) for lack of personal jurisdiction and pursuant to Rule 12(b)(4) for defective service of process. The motion has been decided upon the written submissions of the parties pursuant to Federal Rule of Civil Procedure 78. For the reasons given below, the motion to dismiss for lack of personal jurisdiction will be denied as to defendants Clinton and Dea. The motion will be granted as to defendant Dianetti, and the complaint against him will be dismissed. The Court will reserve judgment as to defendant Miller, and will make further provision for him as explained below. The motion to dismiss for defective service of process will be denied as to all the remaining defendants.

## BACKGROUND

The complaint tells the following story. Plaintiff brings this action under New Jersey's Law Against Discrimination ("NJLAD") alleging racial discrimination against him by his former employer, defendant Xerox, and the individual defendants. Plaintiff is an African–American. The individual defendants are officials of Xerox who are alleged to have perpetrated the discrimi-

natory acts. They are named in their personal capacities and as representatives of the corporate defendant. In addition to the NJLAD claim, plaintiff also alleges state common-law counts of wrongful discharge, intentional infliction of emotional distress, defamation, violation of an implied covenant of good faith in contracts, and interference with contract and prospective economic advantage.

Plaintiff began his employment with Xerox in February, 1986. Until 1993, plaintiff worked in Xerox's Morris Plains, New Jersey office and lived in a nearby town. Plaintiff was employed in what is known as the Indirect Channels Organization ("ICO"). Defendant Dea was the general manager of this subdivision of Xerox. Plaintiff's general field of responsibility throughout his time at the company was the marketing of office machines, either directly or through the development of marketing plans. In 1992, Dea was replaced by defendant Miller as the manager of the ICO.

By 1991, plaintiff had risen to the position of Region Sales Manager—Mid–Atlantic Region. In March of that year, he filed an internal complaint charging that he was being discriminated against because of his race. In summary, the internal complaint alleged that plaintiff's supervisor had curtailed his sales territory and other responsibilities, denied him compensation due for sales he had made, and declared plaintiff's territory "open" while transferring him to a territory that was already occupied. The complaint claimed that these actions were motivated by racial bias and retaliation for previously pursuing his grievances through less formal channels. Plaintiff alleges that he was the first person of his race to hold this position at Xerox, and that white peers did not experience the same difficulties.

Plaintiff brought his problems to defendant Dea and exchanged correspondence with his division personnel manager without receiving satisfaction. In a memorandum dated July 1, 1991, Thomas Penders of Xerox's Human Resources department made what appears to be a settlement offer. Declaration of Charles Wright, dated Feb. 27, 1995 ("Wright Decla.") Exhibit A (Complaint) at

Exhibit C. The memorandum did not admit that racial discrimination had occurred, but recognized "questionable management practices" in plaintiff's case. Plaintiff's performance evaluations were upgraded, and, to resolve the dispute over the sales territory, plaintiff was promoted retroactively. Plaintiff's immediate supervisors and the Human Resources Department agreed to find plaintiff a new assignment in the corporation away from the offending supervisors. After some further negotiation, plaintiff agreed to these basic terms, with the express assumption that Xerox management support his attempts to find a suitable new position within the company. *Id.,* Exhibit E.

The core of the complaint is that the individual defendants did not support plaintiff's attempts to transfer within the company. On the contrary, it is alleged that the defendants retaliated against plaintiff for filing his complaint and further discriminated against him by damaging his reputation within the company. Plaintiff claims that information from his personnel file concerning the internal complaint was wrongfully disseminated within the company, and that he was branded as a troublemaker. It is alleged that other divisions in Xerox failed to offer him a position because of these acts.

Meanwhile, back at ICO, it is alleged that plaintiff's sales territory was eliminated through a reorganization that divided it between two white co-workers. This restructuring is alleged to have been accomplished by defendant Miller, who replaced Dea as plaintiff's manager. However, in December 1992, plaintiff secured an assignment in the Office Document Systems Division ("ODS"), and was given responsibility for developing a marketing plan for a certain printer.

In August of 1993, defendant Clinton became the head of the ODS division. Clinton told defendant that he would have to accept a transfer to the Rochester, New York office, or risk termination. Plaintiff believes that the transfer was part of the ongoing pattern of retaliation against him. When plaintiff arrived at the Rochester office in October of that year, he discovered that his duties were different than those promised by Clinton. He was not permitted to do assignments that

persons from his old New Jersey office specifically requested that he do. Clinton told plaintiff that his former managers had said that he was not liked personally.

Hoping to escape the unsatisfactory situation in Rochester, plaintiff submitted a formal request to transfer. Against normal Xerox policy, and despite the fact that positions in New Jersey had been offered by company managers there, the request was denied by defendant Dianetti. Resigned to the transfer, plaintiff leased his residence and contracted to purchase a house in Rochester. Mrs. Wright took a leave of absence from her job in New Jersey. On January 18, the day the Wright family was to move to Rochester, plaintiff was told that he would be terminated as part of an "Involuntary Reduction in Force."

Plaintiff claims that the reduction in force was a pretext. He alleges that his position was not abolished, but that he was replaced by a white person. This person was laid off in a previous round of terminations, and then re-hired in plaintiff's stead. He maintains that the dissemination of the information in his personnel file, the defamatory statements about his work attitude and propensity for "troublemaking," the transfer, and ultimately his termination were all in retaliation for filing the internal complaint and motivated by racial bias. He claims that if he had been allowed to transfer back to New Jersey, he would not have been terminated at all.

Plaintiff filed this action in the Superior Court of New Jersey, Essex County. Defendants removed it here on the basis of diversity of citizenship. The individual defendants now move for dismissal for lack of personal jurisdiction. As will be discussed more fully below, all live and work for Xerox in the State of New York.

## DISCUSSION

■ In cases where the defendant has raised a jurisdictional defense, "the plaintiff bears the burden of demonstrating contacts with the forum state sufficient to give the court in personam jurisdiction." *Time Share Vacation Club v. Atlantic Resorts, Ltd.*, 735 F.2d 61, 63 (3d Cir.1984) (quoting *Compagnie des Bauxites de Guinee v. L'Union Atlan-*

*tique*, 723 F.2d 357, 362 (3d Cir.1983)). However, upon a Rule 12(b)(2) attack on personal jurisdiction, the Court must accept as true the allegations in the complaint, and resolve disputed issues of fact in favor of the plaintiff. *Carteret Savs. Bank v. Shushan*, 954 F.2d 141, 142 n. 1 (3d Cir.), *cert. denied,* — U.S. ——, 113 S.Ct. 61, 121 L.Ed.2d 29 (1992).

■ This Court may exercise jurisdiction over any person who would be subject to the jurisdiction of the courts of the State of New Jersey. Fed.R.Civ.P. 4(e); *North Penn Gas Co. v. Corning Natural Gas Corp.*, 897 F.2d 687, 689 (3d Cir.), *cert. denied,* 498 U.S. 847, 111 S.Ct. 133, 112 L.Ed.2d 101 (1990). New Jersey's long-arm jurisdiction rule permits personal jurisdiction over non-resident defendants to the extent permitted by due process clause of the Fourteenth Amendment to the United States Constitution. *DeJames v. Magnificence Carriers, Inc.*, 654 F.2d 280, 284 (3d Cir.), *cert. denied,* 454 U.S. 1085, 102 S.Ct. 642, 70 L.Ed.2d 620 (1981).

### 1. Minimum Contacts

*International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945), is continually invoked as the "constitutional touchstone" for due process analysis of personal jurisdiction matters. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474, 105 S.Ct. 2174, 2183, 85 L.Ed.2d 528 (1985). *International Shoe* held that a court may exercise personal jurisdiction over a non-resident defendant only where "minimum contacts" exist such that jurisdiction "does not offend 'traditional notions of fair play and substantial justice.'" 326 U.S. at 316, 66 S.Ct. at 158 (quoting *Milliken v. Meyer*, 311 U.S. 457, 463, 61 S.Ct. 339, 343, 85 L.Ed. 278 (1940)). The purpose of restricting personal jurisdiction to the limits of due process is to protect the individual interests of non-resident defendants. *United States v. Morton*, 467 U.S. 822, 828, 104 S.Ct. 2769, 2773, 81 L.Ed.2d 680 (1984); *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 291, 100 S.Ct. 559, 564, 62 L.Ed.2d 490 (1980).

■ Contacts with the forum sufficient to support personal jurisdiction over a non-

resident defendant must be of a type that the individual "should reasonably anticipate being haled into court there." *Burger King,* 471 U.S. at 474, 105 S.Ct. at 2183 (citing *World–Wide Volkswagen,* 444 U.S. at 295, 100 S.Ct. at 566). What constitutes minimum contacts varies with the "quality and nature of the defendant's activity," *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 1240, 2 L.Ed.2d 1283 (1958), but the unilateral activity of a plaintiff claiming a relationship with a non-resident defendant does not suffice to create the requisite forum contacts. *Id.; Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 416, 104 S.Ct. 1868, 1873, 80 L.Ed.2d 404 (1984); *Kulko v. Superior Court of California,* 436 U.S. 84, 93–94, 98 S.Ct. 1690, 1697–98, 56 L.Ed.2d 132 (1978).

■ Defendants can be subject to either specific or general personal jurisdiction in a forum state. Specific personal jurisdiction may arise from particular or sporadic contacts if the cause of action arises out of, or relates to the defendant's forum related activities. *Helicopteros,* 466 U.S. at 414 & n. 8, 104 S.Ct. at 1872 & n. 8; *North Penn Gas Co.,* 897 F.2d at 690. There is sufficient due process contact for personal jurisdiction if the defendant purposefully has directed his activities at residents of the forum. *Henry Heide, Inc. v. WRH Prods. Co.,* 766 F.2d 105, 108 (3d Cir.1985). Where the nature or quality of a defendant's contact warrants, a single act can support jurisdiction when it is connected with the injury sued upon. *Burger King,* 471 U.S. at 475 n. 18, 105 S.Ct. at 2184 n. 18.

■ If a plaintiff's cause of action against a defendant does not arise out of the defendant's contacts with the forum state, the plaintiff must establish general personal jurisdiction over the defendant. Where defendant's activities in the forum are unrelated to the subject matter of the suit, plaintiff must show "continuous and substantial contacts" with the forum state. *Helicopteros,* 466 U.S. at 414–16 & n. 9, 104 S.Ct. at 1872–73 & n. 9; *Provident Nat'l Bank v. California Fed. Savs. & Loan Ass'n,* 819 F.2d 434, 437 (3d Cir.1987). The Court is satisfied that general jurisdiction does not exist as to any of the individual defendants. Therefore, this branch of the doctrine will not be discussed further.

■ As a threshold matter, the Court will address defendants' claim that they cannot be subjected to the personal jurisdiction of this Court because their actions were pursuant to their duties as Xerox employees. The Court rejects this argument. Xerox's undoubted contacts with this forum will not be attributed to the individual defendants. However, a defendant's status as an employee will not nullify the power of his contacts with the forum to create amenability to suit there. *Educational Testing Serv. v. Katzman,* 631 F.Supp. 550, 559 (D.N.J.1986).

Defendant's citation of *Shapiro v. Sun Life Assurance Co.,* 117 F.R.D. 550 (D.N.J.1987) is unavailing. That case is distinguished by Judge Rodriguez's finding that the plaintiff's allegations showed that the non-resident defendants did not intend to harm the plaintiff, but were acting as "mere conduits" of their corporate employer's policy. *Id.* at 556. The Court distinguished cases like *Calder* in which, as in this case, defendants had the authority within the scope of their employment to intentionally and wrongfully harm the plaintiff. *Id.*[1]

The Supreme Court's mandate to examine the "quality and nature of the defendant's activity," *Hanson,* 357 U.S. at 253, 78 S.Ct. at 1239, requires the Court to give particular weight to contacts with the forum that form the basis of an allegation of an intentional tort. As a matter of logic, where acts are intentional, the Court may assign a height-

---

1. Defendant's reliance on *Violanti v. Emery Worldwide A–CF Co.,* 847 F.Supp. 1251, 1256 (M.D.Pa.1994), an age discrimination case, is also misplaced. There the decision turned in part on an absence of allegations as to defendant's contacts with the forum. The opinion also suggests without elaboration, however, that actions taken in the capacity of an agent or employee will not support personal jurisdiction. *Id.* To the extent that this case holds that participation in discriminatory conduct by corporate agents will not give rise to jurisdictional contacts over them as individuals, this Court declines to follow it. *See Bishop v. Okidata, Inc.,* 864 F.Supp. 416, 422–24 (D.N.J.1994) (criticizing *Violanti* ).

ened level of foreseeability to their consequences. Courts have recognized the special importance of intentional, tortious acts in assessing whether personal jurisdiction over a non-resident defendant is reasonable. *Shushan,* 954 F.2d at 147 (citing *Knight v. San Jacinto Club, Inc.,* 96 N.J.Super. 81, 232 A.2d 462 (Law Div.1967)); *Dakota Indus., Inc. v. Dakota Sportswear, Inc.,* 946 F.2d 1384, 1391 (8th Cir.1991).

The Supreme Court discussed intentional torts in the context of libel in *Calder v. Jones,* 465 U.S. 783, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984), and set forth what is known as the "effects test" for personal jurisdiction over non-resident, intentional tortfeasors. In *Calder,* plaintiff was a well-known actress residing in California. In Florida, defendants wrote a libelous story about the plaintiff for their employer, a nationally distributed magazine. The only contacts the defendant writers had with California were some telephone calls connected with the investigation for the story. The Supreme Court held that the Constitution permitted the California courts to exercise personal jurisdiction over defendants.

 Then Associate Justice Rehnquist wrote for the Court:

> The allegedly libelous story concerned the California activities of a California resident. It impugned the professionalism of an entertainer whose television career was centered in California. The article was drawn from California sources, and the brunt of the harm, in terms both of respondent's emotional distress and the injury to her professional reputation, was suffered in California. In sum, California is the focal point both of the story and of the harm suffered. Jurisdiction over [defendants] is therefore proper in California based on the "effects" of their Florida conduct in California.

*Id.* at 788–89, 104 S.Ct. at 1486–87 (citing *World–Wide Volkswagen,* 444 U.S. at 297–98, 100 S.Ct. at 567–68). Thus *Calder* establishes the proposition that, where intentional tortfeasors know that their actions will harm a plaintiff in a particular forum, and that the brunt of the injury caused by their actions will be felt in that forum, they will be subject to jurisdiction there. *Shushan,* 954 F.2d at 147 (dictum); *Brainerd v. Governors of the Univ. of Alberta,* 873 F.2d 1257, 1259–60 (9th Cir.1989).

 To benefit from the effects test, plaintiff's case must rise or fall with the proposition that the situs of his harm is New Jersey. He argues strenuously that this is the case. Determining where the "brunt of the harm," *Calder,* 465 U.S. at 788, 104 S.Ct. at 1486, is felt requires a difficult, case-specific analysis. *Core–Vent Corp. v. Nobel Indus. AB,* 11 F.3d 1482, 1487 (9th Cir.1993). Plaintiff points to the years he spent in Xerox's service in Morris Plains, and the damage to his reputation and career there from defendants' actions. He points to the expense and disruption to his family from their abortive move to Rochester. This includes sums lost and emotional distress experienced from leaving their New Jersey home, and because his wife was forced to leave her employment in New Jersey. He argues that, but for defendants' actions, he would be employed by Xerox in New Jersey to this day.

For the purposes of jurisdictional analysis, the Court agrees that plaintiff's harm is centered in New Jersey. The gist of the complaint is an ongoing scheme in which defendants interfered with and finally terminated his employment here on account of racial bias and in retaliation for filing an internal complaint concerning discriminatory treatment. *See Burt v. Board of Regents,* 757 F.2d 242, 245 (10th Cir.1985) (damage of malicious falsehood occurs in forum where victims reputation and ability to practice his profession is impaired), *vacated as moot,* 475 U.S. 1063, 106 S.Ct. 1372, 89 L.Ed.2d 599 (1986); *Brown v. PST Vans, Inc.,* 794 F.Supp. 299, 301 (W.D.Ark.1992) (wrongful discharge and defamation which interfered with ability of plaintiff to gain employment in Arkansas constituted an injury in Arkansas). During most of the chain of events that form the basis of this case, plaintiff was a citizen of New Jersey. Plaintiff claims that the relatively short sojourn to Rochester was merely a component of the tortious scheme. The Court need not rule on the severity of these alleged injuries, or even if they rise to a cause of action. It is sufficient that the

center of gravity of the interests alleged to be infringed is within the forum.

Without depreciating plaintiff's other claims, the Court believes that the centerpiece of the complaint consists of plaintiff's allegations under NJLAD and state common-law defamation. The law of long-arm personal jurisdiction is better developed in the area of defamation and libel, therefore it will be discussed first. The jurisdictional implications of the NJLAD claim follow.

 The libel cases that helped articulate the "effects test" establish that one whose utterance injures someone in another state may foresee being sued there. *Calder v. Jones*, 465 U.S. at 789–90, 104 S.Ct. at 1486–87; *Keeton v. Hustler*, 465 U.S. 770, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984). New Jersey law holds that a defendant whose fraudulent communication by mail and telephone harms a New Jersey plaintiff is subject to personal jurisdiction in its courts. *Lebel v. Everglades Marina, Inc.*, 115 N.J. 317, 325–26, 558 A.2d 1252, 1256 (1989). *See also Vishay Intertechnology, Inc. v. Delta Int'l Corp.*, 696 F.2d 1062, 1066 (4th Cir.1982) (" 'Where a defendant knowingly sends into a state a false statement, intending that it should then be relied upon to the injury of a resident of that state, he has, for jurisdictional purposes, acted within that state.' ") (quoting *Murphy v. Erwin–Wasey, Inc.*, 460 F.2d 661, 664 (1st Cir.1972)).

It might be argued that the authorities just cited are distinguishable from this case. In *Calder et alia*, the tortious statements were sent into the forum, in magazines, by telephone or through the mail. Here plaintiff has made allegations of defamation, but it is not specified to whom or where the defamatory statements were made. It may be that Xerox employees defamed plaintiff outside the forum, to third parties who were themselves outside the forum.

In this case, with due regard for the fact sensitive nature of the personal jurisdiction inquiry, the Court believes that the distinction should not control. It is the essence of defamation that the tortious act is not directed at the listener, but at the subject of the defamation. Presumably the victim will not be a party to the conversation at issue, and

may be anywhere, in any forum. The tort-feasor can foresee that the harm of his wrongdoing may be felt in the forum where his victim resides and enjoys his reputation. *See Burt*, 757 F.2d at 245; *James v. HRP, Inc.*, 852 F.Supp. 620, 625 (W.D.Mich.1994). That is the forum to which the wrong was directed. It follows, therefore, that A, in New York, might utter a defamatory remark to B, also in New York, concerning C, a resident of New Jersey, and foresee being haled into court in New Jersey when the remark has its intended effect there.

It may be the unique property of defamation or libel to travel that has caused the law of long-arm jurisdiction to develop in that area. A statutory, civil rights tort such as one under the NJLAD is not so inherently mobile. Nonetheless, if fundamental principles of the "effects test" are sound, and they assuredly are, then they can be applied outside the narrow context in which they arose. *See, e.g., Lebel*, 115 N.J. 317, 558 A.2d 1252 (effects test applied to out-of-state fraud). Discrimination by an out-of-state employer against an employee in this state is an act directed at this state. The harm is felt here, as it was in California in *Calder*. Racially biased decisions taken at a foreign corporate headquarters may wreak injustice on New Jersey's citizens and thwart the cardinal policy of their legislature. Non-resident corporate officials can foresee being made to answer here for such a wrong, and requiring them to do so is not constitutionally unreasonable.

## 2. The Individual Defendants

Harm suffered within the forum is only one part of the effects test. The plaintiff must also show that conduct of the defendants in connection with himself, his injury, and the forum where he resides is such that the defendant "should reasonably anticipate being haled into court there." *Burger King*, 471 U.S. at 474, 105 S.Ct. at 2183. Therefore the Court must examine the acts of each defendant to determine whether he was sufficiently on notice that he might be called upon to answer in this state for wrongfully interfering with the career of one of its citizens.

Thus far the Court has assumed the truth of the plaintiff's allegations for the purposes of this motion. However, as noted, where personal jurisdiction is challenged it is the plaintiff's burden to produce evidence of each defendant's contacts with the forum. *Time Share Vacation*, 735 F.2d at 63. Each of the individual defendants have submitted affidavits in support of their motion. The plaintiff has submitted his own affidavit, which appends and adopts as factual testimony the complaint and other documents in the case. With the foregoing legal principles in mind, the Court will consider the record before it with regard to each individual defendant.

### a. Defendant Clinton

█ Plaintiff avers that he began reporting directly to Clinton in August 1993 while still based in Morris Plains. Wright Decla. ¶ 42. At all times Clinton worked at the Rochester office. *Id.* ¶ 41. On about August 17, Clinton informed Wright in a telephone call that a reorganization necessitated his transfer to Rochester. *Id.* ¶ 43. During this conversation, plaintiff avers, Clinton threatened him with "redeployment" if he did not accept the Rochester transfer. *Id.*, Exhibit A ¶ 24.[2] Clinton said that he had communicated with plaintiff's former supervisors and learned that plaintiff was "not liked" there, and that this would limit his future with Xerox. *Id.*, Exhibit A ¶ 29. Although it is by no means proven, it is reasonable to infer that this shows Clinton contacted Xerox personnel in New Jersey, and that Clinton was participating in the retaliatory scheme. A letter from Clinton announcing the transfer followed on August 31, addressed to Wright in New Jersey. *Id.* ¶ 43, Exhibit B.

On arrival in Rochester, Clinton told plaintiff that his responsibilities would not be those promised in their earlier conversations. *Id.*, Exhibit A ¶ 30. When the Morris Plains office requested that plaintiff return to do a presentation there, Clinton refused to permit it and arranged for another employee to perform the assignment. *Id.* ¶ 34. Wright's final termination letter was signed by Clinton

and sent to Wright's New Jersey address. *Id.* ¶ 45, Exhibit C.

Clinton testifies that he does not communicate with anyone in New Jersey on Xerox business on a regular basis and that he has only visited here only occasionally. Affidavit of William Clinton, dated Feb. 2, 1995 ("Clinton Aff.") ¶ 5. Clinton avers that he has never met plaintiff outside of the Rochester office. *Id.* ¶ 6. He admits that he spoke with plaintiff in two or three telephone conversations about the details of the Rochester position. *Id.* None of the other testimony of plaintiff is specifically contradicted.

The fact that plaintiff may have initiated the telephone calls, *id.* ¶ 5, is relevant, but not dispositive. Placing a telephone call into the forum might be evidence of an act directed at the forum, but it is the substance of the conversation that counts. Plaintiff, when he placed the call, was not soliciting misrepresentations and threats from Clinton. *See Burt*, 757 F.2d at 245 (jurisdiction upheld where plaintiff solicited a recommendation from outside the forum that turned out to be libelous). Clinton's allegedly tortious communications with plaintiff were directed to the forum in furtherance of the acts complained of, no matter who initiated the call.

█ In light of the principles discussed above, these contacts with plaintiff, both in New Jersey and after he was forced to transfer, suffice to put Clinton on notice that his acts might subject him to suit in New Jersey. It is not important that he only met with plaintiff in New York. It is well established that physical presence in the forum is not required to establish jurisdiction. *Burger King*, 471 U.S. at 476, 105 S.Ct. at 2184. The complaint alleges a harm focused in this forum. Plaintiff has sustained his burden to show facts connecting Clinton to the acts complained of and to the forum.

### B. Defendant Dea

█ Dea was in the chain of command at ICO. In his affidavit, Dea testifies that he has visited New Jersey and the Xerox's Mor-

---

**2.** At Xerox, "redeployment" means the loss of one's current position in the company and a requirement that the employee find another posi- tion within the company within 180 days or face termination. Wright Decla., Exhibit A ¶ 25.

ris Plains office only occasionally. Affidavit of Don Dea, dated Feb. 1, 1995 ("Dea Aff.") ¶ 4–5. He testifies that he visited the Morris Plains office in March of 1991 to discuss the issues raised by plaintiff's internal complaint. *Id.* ¶ 6. Dea testifies that plaintiff contacted him directly about job-related issues on occasion, *id.* ¶ 7, and that he had regular contact with plaintiff's management team. *Id.* ¶ 8.

Plaintiff confirms the meeting over the internal complaint. Wright Decla., Exhibit A ¶ 11. He testifies on information and belief that Dea disseminated confidential information from his personnel file about the internal complaint throughout the company in reprisal for plaintiff's filing it. *Id.*, Exhibit A ¶ 20. It will be remembered that plaintiff was told while interviewing for positions within Xerox that he had a reputation as a troublemaker. *Id.*, Exhibit A ¶ 19. Plaintiff states that Dea was involved in the reorganization of his sales territory, also in retaliation for filing the internal complaint. *Id.*, Exhibit A ¶ 22.

As with Clinton, these contacts with the forum, coupled with the participation in the allegedly discriminatory scheme, are sufficient to create jurisdiction over defendant Dea here. Indeed, Dea's travel to New Jersey to deal with the internal complaint, and the fact that the cause of action is intimately connected with the consequences of that complaint, make as strong a case for jurisdiction over this defendant as for Clinton.

### c. Defendant Miller

The factual record with regard to Miller is thin. Miller testifies that he has never visited New Jersey except for airport stopovers. Affidavit of Richard Miller, dated Jan. 30, 1995 ("Miller Aff.") ¶ 5–6. He maintains that he has never visited, telephoned, corresponded or had any other contact with the Xerox Morris Plains office. *Id.* ¶ 7. Miller avers that he cannot remember ever having any contact with the plaintiff and that he has no personal knowledge of the events described in the complaint. *Id.* ¶ 8.

This testimony is strangely at odds with plaintiff's submissions. Review of Wright's declaration and its exhibits gives the impression that Miller was either plaintiff's supervisor, or, at most, one organizational step away

from plaintiff in the ICO. *See* Wright Decla. ¶ 27, 37. Plaintiff testifies that Miller was the general manager of the ICO, reporting to Dea. *Id.* ¶ 37–38. Plaintiff avers that "Defendants Dea and Miller were intimately aware of, concerned with and had occasion to evaluate my performance as a regional sales manager." *Id.* ¶ 25. Because he believes that Miller would have been a source for performance evaluations, plaintiff maintains that Miller was part of the "managerial grapevine" through which the alleged defamatory remarks were passed. *Id.* ¶ 27, Exhibit A ¶ 29. In fact, Miller's signature appears on a performance evaluation of Wright dated March 1993. *Id.*, Exhibit G. Plaintiff also states that Miller, along with Dea, implemented the restructuring of the sales territories so that plaintiff's territory was given to other sales managers. *Id.* 40.

This evidence undermines the credibility of Miller's affidavit, which suggests that he was unaware of the existence of plaintiff until this suit. On the other hand, the record does not as yet contain facts that show with sufficient clarity that Miller was connected with the allegedly discriminatory acts directed toward the plaintiff. Plaintiff's affidavit lacks direct testimony of specific acts by Miller directed toward plaintiff. Moreover, the details of Xerox's corporate structure remain obscure to the Court. They have not been authoritatively laid out by the parties. Consequently, it cannot weigh the merits of the competing assertions as to Millers awareness of, or involvement with, the plaintiff.

For these reasons, the Court will reserve judgment with regard to Miller. The Third Circuit has recently emphasized the importance of an adequate record when ruling on the issue of personal jurisdiction. *Renner v. Lanard Toys Ltd.*, 33 F.3d 277 (3d Cir.1994). The parties are invited to make further factual submissions consistent with this opinion and subject to the terms of the accompanying Order. To adjudicate the motion with regard to this closer case, the Court requires documents outlining the organization of the ICO and the ODS divisions through which plaintiff moved. For these purposes, as well as for prospective assistance to the Court as the case moves forward, the evidence should

explain the position of each of the parties within these organizations, their responsibilities and powers, and the numbers of people at each level.

Moreover, while the Court does not rule out the use of circumstantial evidence of jurisdictional contacts, further factual submissions should be directed toward demonstrating concrete examples of Miller's involvement with the alleged discrimination. For example, evidence that Miller was the one responsible for restructuring plaintiff's sales territory would strengthen plaintiff's case on this point. Discovery may be had by either party as to this defendant, limited strictly to the issue of personal jurisdiction over him.

### · d. Defendant Dianetti

■ Plaintiff testifies that Dianetti was the personnel manager responsible for plaintiff during his tenure in the ODS. Wright Decla. ¶ 47. Plaintiff claims that Dianetti's responsibilities included his appointment to ODS, his transfer to Rochester, his attempt to transfer from Rochester and his termination. *Id.* ¶ 48.

Plaintiff's evidence of Dianetti's involvement with discriminatory acts directed toward him as a New Jersey employee is insufficient. Plaintiff states that Dianetti sent him a letter that contained the initial offer to join ODS in February of 1993.[3] Dianetti was copied on the letter from Clinton to the plaintiff in New Jersey confirming his transfer. *Id.*, Exhibit B. This defendant signed an expense authorization for plaintiff's move to Rochester. *Id.*, Exhibit H. He addressed a letter concerning plaintiff's post-termination benefits to plaintiff's New Jersey residence. *Id.*, Exhibit I.

These contacts do not establish that Dianetti directed his activities toward the plaintiff and his New Jersey-based interests in the manner required to establish jurisdiction over him. No factual averments show that Dianetti was aware of the defamatory remarks alleged to have been made by the other defendants, nor that he made any himself. Contacts such as a moving expense

**3.** This document is not in the record.

authorization and post-termination benefits appear to be merely incidental to the difficulties plaintiff was experiencing. As ministerial acts connected with the legitimate functions of a personnel manager, they do not constitute contacts from which the cause of action arises, and so do not support specific personal jurisdiction.

It is true that plaintiff also alleges Dianetti refused to grant plaintiff a transfer away from Rochester, and thus prevented plaintiff from returning to New Jersey and avoiding termination. Plaintiff also maintains that Dianetti failed to give him his complete copy of his personnel file, because the transfer request was missing from it. These acts occurred well after plaintiff's transfer to Rochester. Unlike, some of the other defendants, it is not clear that they form part of an ongoing pattern of discrimination that began while plaintiff was in New Jersey.

Accordingly, the Court finds that plaintiff has not sustained his burden with regard to Dianetti, and the complaint will be dismissed as to this defendant. The Court does not find it necessary to reserve judgment and invite further submissions as it did with Miller. Unlike Miller, Dianetti's relationship with the scheme and the plaintiff is not ambiguous on the record as it stands now. Plaintiff's showing is simply lacking, and this defendant is entitled to dismissal.

### 3. Reasonableness

■ With regard to Clinton, Dea and Miller, the Court's task is not quite finished. Once minimum contacts giving rise to specific jurisdiction are established the Court must still determine whether the exercise of personal jurisdiction will "comport with 'fair play and substantial justice.'" *Burger King,* 471 U.S. at 476–77, 105 S.Ct. at 2184–85 (quoting *International Shoe,* 326 U.S. at 320, 66 S.Ct. at 160). The Court must consider a list of factors: 1) "the burden on the defendant," 2) "the plaintiff's interest in obtaining convenient and effective relief," 3) "the interstate judicial system's interest in obtaining the most efficient resolution of controversies," and 4) "the shared interest of the states in

furthering fundamental social policies." *Id.* at 477, 105 S.Ct. at 2184; *Shushan,* 954 F.2d at 150.

■ Here, the burden on defendants is slight. This district and the district in which they live are not remote geographically. The plaintiff's interest in convenient relief and the judicial system's interest in efficient adjudication favor a finding of reasonableness. As noted at the outset, Xerox itself is clearly subject to jurisdiction here. The interests just mentioned are clearly served by disposing of the entire case in one forum.

It is the last factor listed that weighs most heavily in favor of a finding that jurisdiction here is reasonable. Few policies can be characterized as more fundamental than that embodied in NJLAD. It serves the interests of New Jersey and her sister states to require racial discrimination to be litigated in the forum where the harm is suffered. Every state has an interest in protecting its citizens from this grievous social wrong when perpetrated by the non-resident managers of large corporations.

## 4. Process

■ One further argument by defendants is quickly dispensed with. They claim that the service of process of the original state court summons and complaint was defective because it was attempted by ordinary mail. The state rules do not permit service by mail on a non-resident defendant unless plaintiff has filed an affidavit stating that after diligent effort and inquiry he has been unable to effect personal service within the state, or if the defendant waives personal service by answering. New Jersey Court Rules 4:4–4(b)(1)(C), (c). In any event, service by mail must be at the non-resident defendant's dwelling house or usual place of abode. *Id.* (b)(1)(C)(i).

In this case, plaintiff's counsel admits that the diligent effort and inquiry affidavit was filed after service by mail was attempted. Plaintiff's Brief at 3. Indeed, the Court has received no sworn averment that the affidavit

was filed at all. Two of the remaining three defendants testify that they received the complaint at their workplaces. Clinton Aff. ¶ 7; Miller Aff. ¶ 9. Apparently in response to defendants' objections, plaintiff's counsel has filed an affidavit detailing steps taken to cure the deficiency. Affidavit of Robert Merenich, dated Feb. 21, 1995 ("Merenich Aff."). Merenich averred that he has caused new summonses to issue for Miller and Dea, and that he planned to re-serve the defendants "in accordance with New Jersey rules." *Id.* ¶ 3. Merenich stated that he had been unable to obtain defendant Clinton's address as of the date of the affidavit, but that he would follow the same procedure with regard to Clinton when that address was obtained. *Id.* ¶ 4.

Defendants argue strenuously that the defect in service is fatal and incurable. The Court does not agree. It is true that Merenich's affidavit follows a faulty attempt to serve by mail at the wrong address. However, defendants overlook this Court's power under 28 U.S.C. § 1448. That statute provides that in removed cases where service in the state proceeding was incomplete or defective, the service "may be completed or new process issued in the same manner as in cases originally filed in [the] district court." *Id.*

The Court would never minimize the importance of proper process or the interests it serves. In this case, however, defendants arguments closely approach, if indeed they do not cross, the line between form and substance. Defendants submissions on the issue of minimum contacts thoroughly establish their antipathy for excursions into New Jersey. An affidavit from plaintiff that he cannot serve them here would be an exercise in redundancy.[4]

Nor can defendants reasonably argue that they have been prejudiced by the defective service. Clearly, actual notice is not lacking. In addition to this motion, plaintiff's counsel represents that defendants have already propounded discovery requests. Plaintiff's Brief at 2. The Court need not reach plaintiff's

---

4. Ironically, defendants' main argument on this issue appears on pages 18 and 19 of their reply brief, although the Rule of the District Court 27

limits reply briefs to 15 pages. The Court will not adopt defendants' enthusiasm for punctilio by striking the offending portion of their brief.

 

waiver argument to find that defendants know of the action and their obligation to respond, and so have not been harmed by plaintiff's fumbling of service on them.

Therefore, the Court will make the following provisions. Plaintiff's counsel has already informed the Court of his efforts to perfect service. Merenich Aff. The Court presumes that these efforts are complete as of this date. Defendants will advise the Court immediately whether, in light of this Opinion, they waive further objections to service. Because the defects in service may create some ambiguity in when the time to answer began, if defendants waive further objections to service they will have from twenty days from the date of this Opinion to file an answer. However, defendants are on notice that if they fail to so waive, any further expense of effecting service will be charged to them. *Cf.* Fed.R.Civ.P. 4(d)(2).

## CONCLUSION

For the foregoing reasons, the motions of the individual defendants' Clinton and Dea to dismiss the complaint for lack of personal jurisdiction over them will be denied. The same motion of defendant Dianetti will be granted. The Court will reserve judgment on the motion of defendant Miller. The parties may make further submissions and conduct discovery consistent with this Opinion and the accompanying Order of the Court. The motion to dismiss for defective service of process will be denied as to all the remaining defendants.

An appropriate Order is attached.

## *ORDER*

In accordance with the Court's Opinion filed herewith,

It is on this 19 day of April, 1995,

ORDERED that the motion of defendant Dianetti to dismiss the complaint against him for lack of personal jurisdiction in this Court is granted; and it is further

ORDERED that the motions of defendants Clinton and Dea to dismiss the claim against them for lack of personal jurisdiction are denied; and it is further

ORDERED that the Court reserves judgment on the motion of defendant Miller to dismiss the complaint against him for lack of personal jurisdiction, and that the parties may, within thirty (30) days of the date of this Order, submit affidavits and documentary evidence in support of or in opposition to the motion consistent with the accompanying Opinion of this Court, and that with respect to defendant Miller discovery may be had as to the issue of personal jurisdiction only; and it is further

ORDERED that defendants' motion to dismiss the complaint against them for defective service of process is denied, and that defendants will communicate to the plaintiff and the Court their waiver of further objections to service within three (3) days of defendants' counsel's receipt of this Order, or bear any further cost of effecting service upon them; and it is further

ORDERED that, if defendants so waive further objections to service of process, their time to answer the complaint will be twenty (20) days from the date of this Order.